## Cummings' Administratrix v. Paducah Grain and Elevator Company.

(Decided December 17, 1920.)

### Appeal from McCracken Circuit Court.

1.  Negligence—Evidence.—Where the plaintiff relies upon the negli-
    gence of the defendant for recovery every fact necssary to show
    negligence must be proved or admitted—it can not be presumed.
2.  Negligence—Actionable Negligence—Trespasser or Licensee.—
    Where a trespasser or licensee was killed by a descending ele-
    vator car while attempting to pass through an elevator shaft,
    and it is shown by the evidence that when the elevator was in
    about one foot of his head he gave an alarm, but there was no
    evidence to show how fast the elevator was going at the time,
    nor whether it could have been stopped by the operator by the
    exercise of the means at hand in time to have averted the danger,
    no actionable negligence was shown.

HENDRICK & BURNS for appellant.

MOCQUOT & BERRY for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

While engaged at his duties as agent and collector
for an insurance company J. H. Cummings visited the
office and plant of the Paducah Grain and Elevator Com-
pany in the city of Paducah, in December, 1918, and
while there attempted to pass through an elevator shaft
and was struck by the elevator car and crushed to death.
His wife as administratrix instituted this action in the
McCracken circuit court against the grain elevator com-
pany to recover for his death. At the conclusion of the
evidence for the plaintiff the court instructed the jury
to find and return a verdict for the defendant, elevator
company, and the administratrix appeals, asking a re-
versal (1) because the elevator company was guilty of

wanton and willful negligence in pulling the cable of the elevator in the wrong direction and thus accelerating the speed of the elevator car in its descent on decedent instead of stopping it; (2) the elevator company was guilty of gross negligence in failing to protect Cummings from injury by the elevator after the discovery of his peril, and for these two reasons erred in giving the peremptory instruction in favor of the elevator company.

It appears from the evidence that Cummings in the performance of his duties as agent for the insurance company had visited the plant of the elevator company on two or more occasions before the accident in which he lost his life. About four o'clock on the day of the accident he went to the office of the company on the second floor of the elevator building and inquired for one of the employes of the elevator company and was told that he would be found in the shelling room of the building on the first floor. Cummings left the office and descended a stairway to an anteroom from which there was a door leading to the street and also a door on the other side leading to the interior of the building. At the foot of the stairs he turned through the door towards the shelling room in which he expected to find the employe with whom he had business. He was walking rapidly; the interior rooms were poorly lighted. He passed through one room and entered the room in which the elevator shaft was located. This shaft was about six or eight feet square and contained an electric elevator car which was operated by different employes of the concern in carrying grain or other products from one floor of the building to another. When the elevator was at the first floor persons passing from the entrance to the building to the shelling room as Cummings was attempting to do, walked over the floor of the elevator, but when the elevator was up they passed through the elevator shaft by swinging or jumping over the hole. The elevator was up at the time Cummings came to the shaft and he attempted to pass through the shaft to reach the shelling room, but when he entered the shaft he discovered the elevator coming down and he cried, "Stop the elevator, stop." At the time he made this cry the elevator was in about one foot of his head. According to the evidence of one witness a clored man was operating the elevator and upon the alarm from Cummings grabbed the cable of the elevator and pulled it up instead of pull-

ing it down, which would have brought it to a standstill. The elevator descended upon Cummings crushing him to death. No one saw the accident except · Mrs. Pearl Spells, who testifies that she came into the anteroom of the elevator building just as Cummings came down the steps from the office and immediately followed him, thinking him to be an employe of the elevator company, into the room where the elevator shaft was located. She it was who testified to Cummings' cry of alarm and to the fact that the elevator was in charge of the colored man whom she says pulled the cable of the elevator in the wrong direction and when he discovered his mistake and the horrible accident that had resulted, jumped from the elevator and ran away. The plaintiff called practically all of the employes or persons in or about the elevator building at the time of the accident but no one of them saw or knew of the accident until after the dead body of Cummings was found beneath the elevator. They therefore knew nothing of what Cummings was doing or how he came to be there at the time of the accident. Each employe of the company testified in substance that he did not start or operate the elevator at the time of the happening of the accident and did not know how the elevator came to be started at that particular time. A foreman in charge of two colored helpers was on the third floor of the building loading sacks of corn cobs into the elevator which was then on a level with the third floor. One of the colored men was bringing the bags of cobs to the elevator while the other one was placing them in the elevator. They had both left the elevator to get other cobs and returned to find that the elevator had descended. By what means or for what reason they did not know. They went down stairs to investigate and found Cummings dead. There is no evidence tending to show that any person in the employ of the elevator company set the elevator in motion at the time it struck Cummings nor that any employe was in the elevator at that moment except what Mrs. Spells states on the subject, and she was not an employe of the concern and does not claim to know the colored man who was in the car or how he came to be there nor his duties, if he had any.

Cummings was either a trespasser or at most a licensee on the premises of the elevator company for he was there at his own instance and for his own benefit and was not directed or invited by anyone connected with the elevator company to go into or pass through

the room in which the elevator shaft was located. The public was not invited or expected to visit this inner room of the elevator plant, and the elevator company owed Cummings no duty save to do him no wanton or willful harm while on its premises. If, the elevator company had an employe on the elevator car at the time it descended upon Cummings and this employe received a signal from Cummings in the elevator hole before the car struck him, indicating he was in peril, it was the duty of the employe and the elevator company, as his master, to use all reasonable means at his command to stop the elevator and save the life of Cummings.

While Mrs. Spells testified that the elevator was coming down and that it was within about one foot of Cummings head at the time Cummings gave the alarm, and she observed the car, she does not state how fast the elevator was traveling or whether it could or could not have been stopped before striking Cummings. Plaintiff also called an expert electrician who had charge of the elevator and had examined it shortly before and immediately after the accident for defects, but this witness was not asked to state in what distance the elevator could be stopped nor was he told the rate at which the car was traveling at the time it descended upon Cummings, and given an opportunity to state whether the car could have been stopped by the exercise of ordinary care in time to have avoided injury to Cummings. All these witnesses were called by the plaintiff and these facts no doubt could have been shown, but they were not, and the trial court taking the view that no violation of duty to Cummings had been shown, sustained the motion for a directed verdict in favor of the elevator company and dismissed the action.

In Cooley on Torts the text is as follows:

"The general rule supported by authorities is that the owner or occupant of premises owes no duty to licensees and trespassers further than to refrain from willful acts of injury," and in commenting upon this text this court in the case of Indian Refining Company v. Moberly, 134 Ky. 822, said, "If this general rule is recognized as the principle applied in this case there could be no recovery, for it is not claimed much less shown that the injury to plaintiff resulted from the willful act of the defendant or its agents."

The case of Johnson v. Paducah Laundry Co., 122 Ky. 369, is in many respects similar to the case at bar.

In that case the laundry company maintained a vat in which it kept hot water, in an open lot near the street. The top of the vat was even with the top of the ground, and Johnson at night time willfully left the street and turned into the lot on which the laundry was situated for purposes of his own. He fell into the vat and was terribly burned. In an action to recover damages we held the laundry not liable because it owed no duty to Johnson, a trespasser, save to do him no willful or wanton harm.

"The rule frequently has been stated that the owner or occupier of land owes no duty to keep his premises safe in behalf of trespassers, idlers, intruders, or others who come thereon without right or invitation. . . . And where danger is patent, and a licensee chooses to remain, he takes on himself all natural and probable results of the danger. . . . Very often the principle has been applied in the case of persons injured by falling through unguarded trapdoors and hatchways, or into excavations on the property. No distinction is to be drawn, according to the general use of terms, between persons coming within the description of 'licensees' and those who are trespassers."

20 R. C. L., pp. 57, 58 and 59.

"The rule is well settled that an owner of premises owes to a licensee no duty as to the condition of such premises, unless imposed by statute, save that he should not knowingly let him run upon a hidden peril, or wantonly or willfully cause him harm. The licensee enters upon the premises at his own risk and enjoys the license subject to its concomitant perils."

29 Cyc. 449.

See also the following cases: Davis v. Ohio Valley Banking & Trust Co. (Ky.), 106 S. W. 843; Faris v. Hoberg, 134 Ind. 269, 39 Am. St. reports 261; Snyder v. Natchez R. River & T. R., 42 La. Ann. 302; Kentucky Distilleries & Warehouse Co. v. Leonard, 25 Ky. L. Rep. 2046, 79 S. W. 281; Ingram v. Forburgh, 73 App. Div. 129, 76 N. Y. Supp. 344.

So in this case the elevator shaft was used in connection with the business of the elevator company on its private premises. The car was run up and down in the shaft to carry grain and other supplies from one floor to another. It was employed in this business at the moment of the accident. At most Cummings was a licensee. His presence on the premises was unknown to the person

operating the elevator. The elevator company, therefore, owed him no duty whatever until it discovered his peril. There was no evidence tending to show his peril was discovered by the elevator company, or by any one in charge of the car in the elevator shaft in time to have avoided injury to him by the exercise of ordinary care. In the absence of such evidence the court properly instructed the jury to find and return a verdict for the elevator company.

Judgment affirmed.